UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANILO PURUGGANAN,<br>    *Plaintiff*,<br><br>    v.<br><br>AFC FRANCHISING, LLC,<br>    *Defendant*. | No. 3:20-cv-00360 (KAD)<br><br><br><br><br><br>November 25, 2020 |

MEMORANDUM OF DECISION RE:
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER (ECF NO. 83)

Kari A. Dooley, United States District Judge:

Plaintiff Danilo Purugganan ("Purugganan," or the "Plaintiff") has moved for a temporary restraining order ("TRO") to enjoin Defendant AFC Franchising, LLC ("AFC" or the "Defendant") from closing on the purchase of certain urgent care franchises developed and monitored by Purugganan pursuant to a Master Development Agreement (the "MDA") entered into between Purugganan and AFC's predecessor-in-interest, Doctors Express Franchising LLC ("Doctors Express"). Also pending before the Court is a motion for preliminary injunction filed by Purugganan against AFC (ECF No. 12), which is currently scheduled for an evidentiary hearing on December 14, 2020. In seeking the TRO, Purugganan asks this Court to maintain the status quo by prohibiting the sale of the franchises at issue until the completion of the scheduled hearing on the motion for preliminary injunction. AFC has filed an opposition to the Plaintiff's application for a TRO (ECF No. 90) and Purugganan filed a Reply on November 21, 2020. (ECF No. 91.) The Court held oral argument on November 24, 2020. (ECF No. 93.)

1

Because Plaintiff offers little more than conclusory allegations and/or speculative and conjectural predictions of irreparable harm, and because the concrete harms he does identify can be addressed through an award of money damages, the motion for a temporary restraining order is DENIED.[1]

**Background**

**Stipulated Facts**

The parties' familiarity with the procedural history of this case and the allegations in the complaint is presumed. The parties have stipulated to the following facts throughout the course of this litigation. (*See, e.g.*, Joint Rule 26(f) Report at 5–7, ECF No. 42; Def.'s. Resp. to Pl.'s Requests for Production at 2–4, ECF No. 66-6.)

On August 26, 2009, Purugganan executed the MDA with Doctors Express, through which he acquired the right to develop and monitor Doctors Express Urgent Care franchises in the territory defined as "New York, NY-1 Sullivan, Westchester and Fairfield Master Territory #3" in exchange for a $189,000 fee. Per the MDA, Purugganan is entitled to receive 50% of the initial franchise fee and 2.5% of the gross sales from each franchise that he develops, monitors, and supports within his territory. In April 2013, AFC acquired all of Doctors Express's assets and obligations. After AFC rejected a third party's offer to purchase certain franchises in Purugganan's territory (the "Connecticut franchises"), AFC and its affiliates began to negotiate AFC's own purchases of the Connecticut franchises. AFC ultimately executed sales contracts with representatives of the Connecticut franchises, although a closing date has not yet been set.

---

[1] AFC also filed a motion to strike certain declarations submitted by Purugganan. (ECF No. 92.) The declarations at issue were submitted principally in support of Purugganan's alternative argument that if the Court determines that the MDA is ambiguous, the Court should look to the declarations to ascertain the intent of the parties. The issues raised in the motion to strike are germane only to the issue of whether Purugganan has demonstrated a likelihood of success on the merits. Because the Court does not reach this issue, the motion to strike is denied as moot.

However, in the affidavit of AFC President Randy Johansen attached to AFC's opposition to Plaintiff's motion for a temporary restraining order, Mr. Johansen states that "AFC plans to close on the purchase of the 13 locations during the first week of December 2020." (Johansen Aff. ¶ 11, ECF No. 90-2.)

If AFC closes on the purchase of the Connecticut franchises, it plans to transform them into AFC corporate stores, in which case Purugganan will no longer provide Servicing or Monitoring Responsibilities as those terms are defined in the MDA. Purugganan will also no longer receive 2.5% of the gross sales of the franchises if they are owned by AFC.

**The MDA**

The parties' dispute boils down to whether the acquisition by AFC of franchises within Purugganan's territory violates the terms of the MDA, with each party offering differing interpretations of the MDA on this question. The MDA is attached to Purugganan's complaint. (Compl. Ex. A, ECF No. 1-1.) Purugganan first notes that the MDA confers upon him certain "master development rights," including:

> the rights to (1) develop, open and operate Doctors Express Urgent Care Businesses in a mutually-agreed geographic area identified in Exhibit A (the "Territory"); (2) assist us with the sale of franchises (the "Franchises") to third parties (the "Franchisees") who will operate Doctors Express Urgent Care Businesses and/or manage Doctors Express Urgent Care Centers in the Territory; and (3) perform certain initial and ongoing support and assistance functions for (collectively, the "Servicing Responsibilities") and monitor the performance of (collectively, the "Monitoring Responsibilities") Franchisees in the Territory (collectively, the "Master Developer Rights").

(MDA Preamble § E.) Following completion of Doctors Express's training program, the MDA authorizes Purugganan to "solicit, evaluate, and screen individuals and entities to establish and operate Franchises within the Territory" subject to Doctors Express's ultimate approval. (*Id.* § 1.1(b).) It also requires him to develop and maintain at least one franchised Doctors Express Urgent Care Business in his territory no later than one year after the execution of the MDA, and

3

to either develop and open or generate a referral leading to the opening of one such franchise each calendar year thereafter. (*Id*. §§ 1.1(a), 1.2.) Purugganan's failure to comply with these obligations confers upon Doctors Express the right to terminate the parties' agreement. (*Id*. § 1.2.) However, the MDA does not require Purugganan to perform any Servicing or Monitoring Responsibilities for other franchises that Doctors Express or its affiliates may subsequently own. (*Id*. § 1.3(a).)

The MDA also obligates Purugganan to spend $3,000 per quarter on franchise sales efforts. (*Id*. § 8.1.) It entitles him to a fee defined as 50% "of the Initial Franchise Fee" for each prospect that Purugganan refers and with whom Doctors Express signs a franchise agreement within a certain period of time. (*Id*. § 4.1(a).) The MDA also specifies the circumstances in which Purugganan is entitled to a commission or fee in the event that a referral source or an existing franchisee refers a prospect to Doctors Express with whom a franchise agreement is executed. (*Id*. §§ 4.1(b)–(c).) As noted previously, Purugganan receives a fee comprised of 2.5% of the gross sales of each franchise for which he performs Servicing Responsibilities and Monitoring Responsibilities. (*Id*. § 4.2(a).)

Purugganan emphasizes that the MDA provides that Doctors Express (or its assignee) "will not grant another master developer the right to solicit Prospects for Doctors Express Urgent Care Businesses in the Territory." (*Id*. § 1.4; *see also id*. § 22(i).) It is principally this provision that Purugganan claims precludes the proposed purchases by AFC. Specifically, Purugganan argues that AFC's effort to transform the Connecticut franchises into AFC corporate stores is tantamount to AFC itself operating as a master developer and competing with the Plaintiff in his territory.

However, the next sentence in § 1.4, on which AFC focuses, provides:

> Except as expressly granted by this Section 1.4, we and our affiliates retain all rights with respect to identification of Prospects and Franchisees for Doctors Express Urgent Care

4

> Businesses and Doctors Express Urgent Care Centers, the System, operation of businesses under the Marks, the sale of franchises for similar or dissimilar services, the operation of businesses offering similar or dissimilar services and any other activities we deem appropriate whenever and wherever we desire and you acknowledge that we have not granted you any exclusive rights.

(*Id*. § 1.4.) AFC thus argues that this provision expressly authorizes AFC to operate within the territory however it sees fit, to include acquiring existing franchises and operating them as corporate stores. AFC further asserts that the conversion of the Connecticut franchises therefore will not infringe upon any of Purugganan's rights as a master developer.

**Legal Standard**

"Issuance of preliminary injunctive relief, such as a TRO or preliminary injunction, is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Reidy*, 477 F. Supp. 2d 472, 474 (D. Conn. 2007) (quoting *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005)). "The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Maxum Petroleum, Inc. v. Hiatt*, No. 3:16-CV-01615 (VLB), 2016 WL 5496283, at *1 (D. Conn. Sept. 28, 2016) (quoting *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009)). "When considering whether to issue a temporary restraining order, the court employs the same standard used to review a request for a preliminary injunction." *Baltas v. Maiga*, No. 3:20-CV-1177 (MPS), 2020 WL 6275224, at *20 (D. Conn. Oct. 26, 2020); *see also, e.g.*, *Merrill Lynch*, 477 F. Supp. 2d at 474–75 (applying same standard to both types of requests for preliminary injunctive relief).

This standard requires the moving party to "establish '(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground

5

for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction.'" *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183–84 (2d Cir. 2019) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009)).[2] "To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty'"—rather, "'[h]e need only make a showing that the probability of his prevailing is better than fifty percent.'" *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).[3]

"'A showing of irreparable harm is the single most important prerequisite' for the issuance of a temporary restraining order." *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 447 (D. Conn. 2020) (quoting *Faiveley*, 559 F.3d at 118). "To satisfy the irreparable harm requirement, the [Plaintiff] must demonstrate that, absent a temporary restraining order, '[he] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" *Id.* (quoting *Faiveley*, 559 F.3d at 118.) "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore*, 409 F.3d at 510.

**Discussion**

It is undisputed that on October 30, 2020, AFC transmitted a letter to Plaintiff's counsel indicating that it was providing 30 days' notice of its intent to close on the purchase of a group of franchises that included the Connecticut franchises. Purugganan asserts that he needs to obtain

---

[2] Courts may also consider whether the balance of equities tip in the moving party's favor, and whether "an injunction is in the public interest." *E.g.*, *Basank v. Decker*, 449 F. Supp. 3d 205, 210 (S.D.N.Y. 2020) (quotation marks omitted). Purugganan's motion does not explicitly address these issues.

[3] However "when the injunction sought 'will alter rather than maintain the status quo' the movant must show 'clear' or 'substantial' likelihood of success." *No Spray Coal., Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001) (*per curiam*). Because Purugganan merely seeks to maintain the status quo by preventing the closing of the Connecticut franchises, this heightened standard is inapplicable.

the TRO to prevent AFC from closing on the Connecticut franchises before the December 14, 2020 hearing on his motion for a preliminary injunction; otherwise, the hearing may be rendered moot. To date, no specific closing date has been identified by AFC.

In terms of the irreparable harm that he will suffer if the closings are consummated before the December 14 hearing, Purugganan alleges that he will suffer "substantial loss of business opportunities, loss of customer relationships and loss of goodwill," which he asserts "cannot be remedied in full by money damages and therefore constitute irreparable damages." (Pl.'s Mem. at 8, ECF No. 84.) He does not cite to any evidence in support of this contention, outside of his own conclusory statement that:

> AFC's purchase and transformations to "corporate stores" of the Connecticut franchises would cause irreparable harm to me and would terminate the franchises, and the footprint that I have built within my territory, together with the time effort and resources as well as the excellent reputation and good will I have established in developing these four franchises[4] in my Connecticut territory. . . .
>
> Such purchases and transformations to "corporate stores" would further prevent me from developing, supporting and monitoring other potential centers to franchisees within my territory.

(Purugganan Decl. ¶¶ 17–18, ECF No. 84-1.) Yet Purugganan does not explain in any concrete fashion *how* these purchases will harm his reputation or goodwill, or how he will be otherwise impeded in performing his role as a master developer. *Cf. Home It, Inc. v. Wupin Wen*, No. 19-CV7-070 (MKB) (VMS), 2019 WL 7168370, at *2 (E.D.N.Y. Dec. 23, 2019) ("Plaintiff's conclusory allegation that 'relief is urgently needed to protect Plaintiff's reputation and good will, and to restore its product offerings on the Amazon online portal' . . . without further facts as to *how* its reputation and good will is being damaged, and *how* a TRO would work to restore its reputation, is insufficient to establish that an 'extraordinary remedy,' like a TRO, is appropriate");

---

[4] Purugganan appears to believe that there are four Connecticut franchises while AFC refers to three franchises that are located in the Plaintiff's territory. This difference is not material to the Court's ruling on the instant motion.

*Rush v. Hillside Buffalo, LLC*, 314 F. Supp. 3d 477, 486 (W.D.N.Y. 2018) ("In failing to supply evidence of the loss of reputation or good will beyond his own conclusory averments, Plaintiff has not made a sufficient showing that irreparable harm is likely at this point in this action"). The case Purugganan cites in support of his assertion of irreparable harm, moreover, *Country Fare LLC v. Lucerne Farms*, No. 3:11-CV-722 (VLB), 2011 WL 2222315 (D. Conn. June 7, 2011), is inapposite yet nonetheless illustrative. There, the plaintiff presented testimony that not only described the anticipated erosion of his customer base as a result of the defendant's allegedly infringing activities but also established that the product that was the subject of the defendant's allegedly infringing trademark accounted for 90% of the plaintiff's annual sales and that the plaintiff "would likely fail as a business without continued sales of the product." *Id*. at *4.

Here, Purugganan has not presented any evidence that his livelihood as a master developer faces any kind of comparable existential threat. And it is utterly unclear on the current record how AFC's acquisition of these franchises in Purugganan's territory would harm Purugganan's relationships or goodwill with the franchisees, who are entitled to transfer their interests in the franchises and presumably intend to do so voluntarily and because they believe it is in their best interests. Nor does Purugganan explain in any non-conjectural fashion how a conversion of these franchises to corporate stores will impact his relationships or goodwill with other franchisees within his Territory. He merely speculates that he will be forced into a competitive relationship with the acquired franchises, a speculation denied by AFC.[5] It is also far from apparent that the closing of these purchases will in any way preclude Purugganan from fulfilling an obligation to

---

[5] On this issue, AFC provides the affidavit of Randy Johansen in which he avers that AFC purchased franchises in a similar fashion in Tennessee and that the relationship between the master developer in that territory and AFC has been cooperative, successful, and mutually beneficial to all parties involved. (*See* Johansen Aff. ¶¶ 14–15.) Mr. Johansen further avers that "AFC has no plans to compete directly with the other franchised locations in Mr. Purug[g]anan's territory, but rather, has every intention and incentive to assist his locations to succeed through coordinated marketing and advertising campaigns similar to the relationship with the Master Developer in Tennessee." (*Id*. ¶ 15).

these or other franchisees, thereby hindering his business relationships with them. While Purugganan asserts vaguely that "[t]he loss of the four centers in Plaintiff's Connecticut territory will have a significant, material and detrimental impact on Plaintiff's reputation, business and success" (Pl.'s Mem. at 8), such purported harms remain completely illusory on the current record. There is simply no tangible or identifiable loss to Purugganan beyond the loss of revenue to Purugganan if he is stripped of his master developer responsibilities for the Connecticut franchises. As noted previously, "[i]t is settled law that when an injury is compensable through money damages there is no irreparable harm." *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 607 (S.D.N.Y. 2014) (quotation marks omitted).[6]

In short, because the Plaintiff's prospective harm–comprised of lost profits amounting to 2.5% of gross sales from the Connecticut franchises—is readily calculable, and his unsubstantiated allegations of lost business opportunities, customers, and goodwill are entirely speculative, he cannot prevail on his motion for a temporary restraining order. *See, e.g.*, *StormTech LLC v. Cultec, Inc.*, No. 3:15-CV-1890 (AVC), 2016 WL 11583945, at *1 (D. Conn. May 4, 2016) (denying motion for preliminary injunction for lack of irreparable harm, as plaintiff's general manager "provides no evidence to suggest that monetary damages are inadequate nor does he provide evidence to support the assertion that harm to [plaintiff's] reputation or customer goodwill is likely"); *Safe Step Walk-In Tub Co. v. CKH Indus., Inc.*, No. L 5-CV-07543 (NSR), 2015 WL 6504284, at *2 (S.D.N.Y. Oct. 26, 2015) (holding that the defendant's "generalized and conclusory

---

[6] Even if Purugganan had identified an evidentiary basis for his claim of lost goodwill, under circumstances such as those presented here, where the Plaintiff's business has a lengthy history of quantifiable profits, goodwill is a calculable harm and thus compensable with money damages. *See, e.g.*, *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63–64 (2d Cir. 2011) (concluding that "Appellants' argument that the loss of goodwill will be irreparable fails in light of [their] long history" of "operations that will enable the Plaintiffs to calculate any money damages to which they might be entitled"); *Pirtek USA, LLC v. Zaetz*, 408 F. Supp. 2d 81, 86 (D. Conn. 2005) (finding absence of irreparable harm where "the court heard undisputed evidence at the hearing as to exactly how much any illegally acquired goodwill was worth" and concluding that the plaintiff's "loss of goodwill, if any, can therefore be compensated with money damages").

statements concerning the termination of employees and the ultimate demise of its business" were "insufficient as a matter of law to demonstrate the requisite harm for injunctive relief," and noting that "[w]hen dealing with contracts, damages are the rule, not the exception") (quotation marks omitted); *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, No. 11-CV-325 (RJH), 2011 WL 1419612, at *7 (S.D.N.Y. Apr. 11, 2011) ("[A] loss of prospective goodwill can constitute irreparable harm, though not where the loss of goodwill was doubtful and lost profits could be compensated with money damage") (quotation marks and internal citation omitted); *Fox Ins. Co. v. Envision Pharm. Holdings, Inc.*, No. CV-09-0237 (SJF) (ARL), 2009 WL 790312, at *7 (E.D.N.Y. Mar. 23, 2009) (holding that the defendant's "speculative and conclusory allegations are insufficient to establish irreparable harm" where the defendant "has not demonstrated that the very viability of its business is threatened absent an injunction," and noting that "[t]he 'mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction'") (quoting *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 934 F.2d 30, 34 (2d Cir. 1991)).

Because the Court concludes that Purugganan has not carried his burden of showing irreparable harm at this stage of the proceedings, the Court need not consider the likelihood of success on the merits. *See, e.g.*, *Rush*, 314 F. Supp. 3d at 486 ("Having determined that Plaintiff has not established the existence of irreparable harm, the Court does not address the other factors necessary for the issuance of a temporary restraining order").[7]

---

[7] As noted previously, in deciding whether to issue a temporary restraining order, courts will sometimes also consider, in addition to the movant's likelihood of success on the merits and likelihood of irreparable harm, whether "the balance of equities tip[] in his favor, "and whether "an injunction is in the public interest." *Basank*, 449 F. Supp. 3d at 210 (quotation marks omitted). Though Purugganan has not addressed these latter factors explicitly, AFC has presented evidence that enjoining the closing of the Connecticut franchises may undermine the contractual rights and interests of third parties. According to AFC, the purchase of the Connecticut franchises is part of a larger transaction for which AFC has secured approximately $32 million in financing to purchase 13 franchise locations, and "[t]he financing is contingent on the purchase of all 13 locations." (Johansen Aff. ¶¶ 9–10.) Tom Kelly, who owns three franchises in Purugganan's territory, intends to sell these to AFC in addition to four other franchise locations, though he "cannot close on the purchase of [his] 7 locations unless all 7 are included in the transaction." (Kelly Aff. ¶ 9, ECF No. 90-3.) Kelly represents that if Purugganan prevents the closing of his seven franchises, he will suffer $13,300,000 in

**Conclusion**

For the foregoing reasons, the Plaintiff's motion for temporary restraining order is denied.

**SO ORDERED** at Bridgeport, Connecticut, this 25th day of November 2020.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

damages. (*Id*. ¶ 10.) Because the Court denies the motion for a temporary restraining order based on the absence of a showing of irreparable harm, the Court need not render findings on these issues. *See, e.g.*, *Amato v. Elicker*, 460 F. Supp. 3d 202, 216 (D. Conn. 2020) (declining to consider public interest or balance of the equities after determining that plaintiffs failed to demonstrate standing or irreparable harm so as to warrant preliminary injunctive relief).