## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANILO PURUGGANAN, | No. 3:20-cv-00360 (KAD) |
| *Plaintiff*, | |
| v. | |
| AFC FRANCHISING, LLC, | February 24, 2021 |
| *Defendant*. | |

## MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR PARTIAL JUDGMENT ON THE PLEADINGS (ECF NO. 58)

Kari A. Dooley, United States District Judge:

Defendant AFC Franchising, LLC ("AFC" or the "Defendant") has moved to dismiss several of the claims asserted against it by Plaintiff Danilo Purugganan ("Purugganan" or the "Plaintiff") pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. (ECF No. 58.) Specifically, AFC challenges Purugganan's standing to bring claims for a violation of the Sherman Act (Count Seven), tortious interference with contractual relations and prospective economic advantage (Count Eight), violation of the Connecticut Franchise Act, or "CFA" ( Count Ten), violation of the Connecticut Unfair Trade Practices Act, or "CUTPA" (Count Eleven), and abuse of process. (Count Twelve) In the alternative, AFC moves pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings with respect to these claims. AFC additionally challenges the Plaintiff's ability to state claims for a violation of the covenant of good faith and fair dealing (Count Three), violation of the Uniform Commercial Code, or "UCC" (Count Four), and promissory estoppel (Count Five). The parties' familiarity with the procedural history of this case

1

and the allegations in the complaint is presumed.  The Court has considered Purugganan's opposition to the motion to dismiss (ECF No. 65) and AFC's reply.  (ECF No. 68.)  For the reasons that follow, the motion is GRANTED in part and DENIED in part.

**Legal Standards**

### Motion to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 712 (2d Cir. 2019) (*per curiam*) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "Article III, Section 2 of the Constitution limits the jurisdiction of the federal courts to the resolution of 'cases' and 'controversies.'" *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (internal quotation marks omitted).  "This limitation is 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Id*. (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

"A plaintiff can demonstrate standing [under Article III] by establishing three elements: (1) an injury-in-fact; (2) causation; and (3) redressability." *Vullo v. Office of Comptroller of Currency*, 378 F. Supp. 3d 271, 282 (S.D.N.Y. 2019) (citing *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273–74 (2008)).  "Under the injury-in-fact requirement, 'the first and foremost' element, 'a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *Id*. (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016)).  As to the second element, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Rothstein v. UBS AG*, 708

F.3d 82, 91 (2d Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (alterations, ellipses, and emphasis omitted).  "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* (quoting *Lujan*, 504 U.S. at 560–61).

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  *Mercer v. Schriro*, 337 F. Supp. 3d 109, 122 (D. Conn. 2018) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).  "The plaintiff bears the burden of alleging facts that affirmatively and plausibly suggest that [he] has standing to sue."  *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (quotation marks and alterations omitted).  In resolving a motion to dismiss on this basis, the Court may also consider "evidence outside the complaint."  *Id.*

**Motion for Judgment on the Pleadings**

"A party may move for judgment on the pleadings 'if, from the pleadings, the moving party is entitled to judgment as a matter of law.'"  *Rojas v. Berryhill*, 368 F. Supp. 3d 668, 669 (S.D.N.Y. 2019) (quoting *Burns v. Int'l Sec. Serv., Inc. v. Int'l Union, United Plant Guard Workers*, 47 F.3d 14, 16 (2d Cir. 1995)).  "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim."  *Hogan v. Fischer*, 738 F.3d 509, 514–15 (2d Cir. 2013) (quoting *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006)).  Under this standard, the Court must accept the complaint's factual allegations as true and must draw inferences in the plaintiff's favor.  *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).  The motion "must be decided on 'facts stated on the face of the complaint, in documents appended to the complaint or

incorporated in the complaint by reference, and matters of which judicial notice may be taken.'" *Lunardini v. Mass. Mut. Life Ins. Co.*, 696 F. Supp. 2d 149, 155 (D. Conn. 2010) (quoting *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)) (brackets omitted).  The "complaint must 'state a claim to relief that is plausible on its face,'" setting forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Kolbasyuk v. Capital Mgmt. Servs., LP*, 918 F.3d 236, 239 (2d Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Accordingly, 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678) (brackets omitted).

## Discussion

### Standing

AFC first asserts that Plaintiff's allegations of damages are too speculative to establish Article III standing with respect to the Plaintiff's Sherman Act, tortious interference, CFA, CUTPA, and abuse of process claims.  (Counts Seven, Eight, Ten, Eleven, and Twelve, respectively).  This argument derives from the Plaintiff's allegations that he will suffer economic losses as a result of AFC's anticipated closing on the purchase of certain urgent care franchises within the Plaintiff's territory.  (*See, e.g.*, Compl. ¶¶ 83, 89–92, 95, 109, 115, 121, ECF No. 1.)  Although it is the Court's understanding that AFC has since closed on the purchases of the franchises at issue, "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).  "Allegations of future harm establish injury in fact as long as

the future harm is 'certainly impending.'"  *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 746 (S.D.N.Y. 2017) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

The Court easily concludes that the harm Purugganan alleges was sufficiently imminent or "certainly impending" at the time the complaint was filed, given his assertion that AFC had entered into contracts to purchase the franchises at issue, which Purugganan alleges constitutes a breach of the parties' Master Developer Agreement ("MDA").  (*See, e.g.*, Compl. ¶¶ 21, 30, 54–56.) Therefore even if the closings had not yet occurred, the allegations indicating that the transactions were underway support Purugganan's standing to bring claims based on AFC's alleged breach of the MDA and Purugganan's attendant anticipated losses, which also form the basis for the other common law and statutory causes of action.  Moreover, as the Court observed in its memorandum of decision denying the Plaintiff's motion for temporary restraining order, the Plaintiff has identified a concrete harm in the form of lost profits comprised of 2.5% of gross sales from the franchises that AFC has recently acquired or will soon acquire that will no longer inure to the Plaintiff under the MDA if the Plaintiff is stripped of his master developer responsibilities for these franchises.  (*See* Decision at 9, ECF No. 94).[1]  These lost profits are sufficient to satisfy the injury-in-fact requirement of Article III.  *See, e.g.*, *Fido's Fences, Inc. v. Radio Sys. Corp.*, 999 F. Supp. 2d 442, 449 (E.D.N.Y. 2014) (concluding that "economic harm to [the plaintiff's] business— *i.e.*, lost sales and profits—is sufficiently 'concrete and particularized,' as well as 'actual or imminent,' to constitute injury in fact under Article III" where plaintiff alleged that defendants' exclusionary practices harmed its existing business).

---

[1] Indeed, AFC has stipulated to the fact that Purugganan will be deprived of these profits if it closes on the franchises at issue throughout this litigation.  (*See, e.g.*, ECF No. 66-6 at 4.)

The Court therefore denies Defendant's motion to dismiss to the extent it is predicated on the Plaintiff's purported lack of Article III standing and next considers the remainder of the Defendant's claims under the standard applicable to Fed. R. Civ. P. 12(c).

**Choice of Law**

As a threshold matter the parties dispute whether the choice of law provision included in the MDA executed between the Plaintiff and AFC's predecessor-in-interest, Doctors Express Franchising, LLC ("Doctors Express") governs the instant action.  That provision provides:

> Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 *et seq*.), or other federal law, this Agreement and all claims arising from the relationship between us and you will be governed by the laws of the State of Maryland, without regard to its conflict of laws rules, except that any Maryland law regulating the sale of franchises or business opportunities or governing the relationship of a franchisor and its franchisee will not apply unless its jurisdictional requirements are met independently without reference to this paragraph.

(MDA § 19.6, ECF No. 1-1.)  AFC argues that because Plaintiff's claims arise under the MDA and from the Plaintiff's relationship with AFC generally, the law of Maryland applies to this dispute.

"The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clause."  *Fin. One Pub. Co. v. Lehman Bros. Special Fin*., 414 F.3d 325, 332 (2d Cir. 2005).  "Connecticut follows the Restatement (Second) of Conflict of Laws, which enforces choice of law provisions unless (i) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (ii) application of that state's law would contradict a fundamental policy of a state that has a materially greater interest in the action and whose law would otherwise apply had it not been

for the parties' choice." *Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, 123 F. Supp. 3d 343, 350 (D. Conn. 2015) (citing *Elgar v. Elgar*, 238 Conn. 839, 850, 679 A.2d 937 (1996)).

Citing this rule as articulated in the Restatement, Purugganan argues that Maryland law does not apply in this matter because "neither of the parties has any relationship with the State of Maryland, nor do the subject transactions that precipitated this proceeding – *i.e.*, the purchase of the franchises in Connecticut." (Pl.'s Mem. at 6.) Thus, Purugganan asserts that "[i]t cannot reasonably be disputed that Connecticut has the materially greater interest in the determination of the issues in this case." (*Id.*) AFC responds that "each party is 'connected' to Maryland," given that Purugganan "negotiated with a Maryland resident to enter into the MDA," *i.e.*, Doctor's Express, and AFC took an assignment from, and stands in the shoes of, that Maryland resident.[2] (Def.'s Reply at 2.) AFC further asserts that the "transaction," also has a "substantial relationship" to Maryland insofar as the claims arise out of the transaction memorialized in the MDA. Finally, AFC argues that the Plaintiff has failed to establish that applying Maryland law to this dispute would undermine Connecticut public policy.

The Court concludes that it must honor the choice of law provision specified in the MDA. That Doctors Express was located in Maryland at the time the MDA was executed is sufficient to establish a substantial relationship between Maryland and one of the original contracting parties and to the underlying transaction between Purugganan and Doctors Express. *See, e.g.*, *Mark v. Deere & Co.*, No. CV 960563160S, 1999 WL 669818, at *2 (Conn. Super. Ct. Aug. 18, 1999) (honoring Illinois choice of law provision where "Illinois is the principal place of business of one of the parties"). Indeed, the commentary to the Restatement recognizes this proposition explicitly, explaining that "[w]hen the state of the chosen law has some substantial relationship to the parties

---

[2] Purugganan acknowledges that "Doctors Express' principal place of business was in the State of Maryland." (Compl. ¶ 43.)

or the contract, the parties will be held to have had a reasonable basis for their choice. This will be the case, for example, when this state is . . . where one of the parties is domiciled or has his principal place of business."  Restatement (Second) of Conflict of Laws § 187 cmt. f.  Although AFC, as the successor-in-interest to Doctors Express, is not domiciled nor has its principal place of business in Maryland, Purugganan cites no authority that would justify disregarding the original contracting parties' choice of law provision in these circumstances.  Nor can Purugganan reasonably argue that the choice of law provision was not foreseeable to him.  Unlike the MDA's "floating" forum selection clause, which this Court declined to interpret as requiring that the instant suit be brought in Alabama, where AFC maintains its principal place of business (*see* ECF No. 39), the choice of law provision unambiguously apprised Purugganan that save for certain exceptions not applicable here, "this Agreement and all claims arising from the relationship between us and you will be governed by the laws of the State of Maryland."  (MDA § 19.6.)

Moreover, even allowing that Connecticut has a materially greater interest in the outcome in this suit because it is where the franchises at issue are located, Purugganan does not cite any fundamental Connecticut policy which would override the choice of law provision.  As the Restatement cautions, "the forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law."  Restatement (Second) of Conflict of Laws § 187 cmt. g.  The Court therefore concludes that the substantive law of Maryland governs this dispute.

**CUTPA**

This Court's decision with respect to the MDA's choice of law provision necessitates judgment on the pleadings in favor of AFC on the Plaintiff's CUTPA claim.  AFC cites the Court to *Alpha Beta Capital Partners, L.P. v. Pursuit Inv. Mgmt., LLC*, 193 Conn. App. 381, 219 A.3d

801 (2019), *cert. denied*, 334 Conn. 911, 221 A.3d 446 (2020), and *cert. denied*, 334 Conn. 911, 221 A.3d 446 (2020), a case in which the Connecticut Appellate Court held that a New York choice of law provision contained in a settlement agreement precluded the plaintiff from bringing a statutory theft and CUTPA claim under Connecticut law.  *See id*. at 426–27.  Specifically, the choice of law provision at issue encompassed "any disputes or litigation arising out of this agreement."  *Id*. at 426 (alterations omitted).  And because the plaintiff's CUTPA and statutory theft claims "arose" from the settlement agreement, the Appellate Court held that the trial court properly struck them from the plaintiff's complaint.  *Id*. at 427.  Here, too, Purugganan's claims arise from the MDA and his relationship with AFC thereunder.  (*See* MDA § 19.6 ("this Agreement and all claims arising from the relationship between us and you will be governed by the laws of the State of Maryland . . . .").)[3]

Purugganan responds "that since CUTPA is a self-avowed public policy statute, even if the Court determines that Maryland law should be applied, CUTPA cannot be waived by the choice of law provision in the MDA and CUTPA would be applicable in this case."  (Pl.'s Mem. at 12.)  However he cites no authority for this proposition and the Court has located none.  And while Purugganan is correct that the Appellate Court in *Alpha Beta Capital Partners* declined to entertain this very argument because it was not raised before the trial judge, the question that the Appellate Court did not consider is the very one that this Court has already resolved—*i.e*., whether the Court

---

[3] The Connecticut Appellate Court in *Alpha Beta Capital Partners* applied New York law in analyzing the scope of the settlement agreement's choice of law provision.  *See* 193 Conn. App. at 424–25.  The scope of the MDA's choice of law provision must likewise be interpreted under the MDA's governing law—*i.e*., the law of Maryland.  As noted in a case cited by AFC, "Maryland follows the objective law of contract interpretation and construction," and will give effect to the "ordinary, plain meaning" of words "read in the context of the choice of law provision."  *Tomran, Inc. v. Passano*, 391 Md. 1, 13–14, 891 A.2d 336 (Md. 2006).  The parties do not dispute the breadth of the MDA's choice of law provision, and there can be no question that the plain meaning of the phrase "this Agreement and all claims arising from the relationship between us and you" would extend to Purugganan's CUTPA claim based on AFC's alleged unfair and deceptive practices in infringing on Purugganan's rights under the MDA to develop his territory.

should decline to apply Maryland law under the rationale articulated in Section 187 of the Restatement, which includes the public policy of the forum analysis. *See* 193 Conn. App. at 422 n.24 (citing *Elgar*, 238 Conn. at 850). Again, because Purugganan cites no authority in support of the proposition that CUTPA's public policy origins override an otherwise valid choice of law provision, the Court declines to abrogate the parties' agreement to apply Maryland law.

**The Connecticut Franchise Act**

Purugganan alleges that AFC improperly terminated his rights under the MDA in violation of the Connecticut Franchise Act, which states in relevant part that "[n]o franchisor shall, . . . terminate, cancel or fail to renew a franchise, except for good cause which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement." Conn. Gen. Stat. § 42-133f(a). Despite its reliance on the MDA's Maryland choice of law provision, AFC does not argue that the CFA is inapplicable, and the statute itself precludes a waiver of a franchisee's rights thereunder. *See id.* § 42-133f(f); *see also B & E Juices, Inc. v. Energy Brands, Inc.*, No. 3:07-CV-1321 (MRK) (WIG), 2007 WL 3124903, at *11 (D. Conn. Oct. 25, 2007) (explaining that "courts have generally addressed the applicability of the Connecticut Franchise Act in cases involving a purported franchisee located in Connecticut, even in the face of a choice-of-law provision applying the law of another state or forum selection clause placing jurisdiction in another forum").

Instead AFC asserts that the CFA does not apply because Purugganan is not a franchisee but, rather, a master developer who assists in the identification of prospective franchisees and supervises those franchises that AFC accepts under its system. A "franchisee" is defined under the statute as "a person to whom a franchise is granted, including a distributor, wholesaler or jobber or retailer who is granted the authority under a franchise to use a trademark, tradename, service

mark or other identifying symbol or name," and a "franchisor" in turn is one "who grants a franchise to another person."  Conn. Gen. Stat. §§ 42-133e(c)-(d).  "Franchise" is defined in relevant part as:

> an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate.

*Id*. § 42-133e(b).  "The definition 'requires a two-step inquiry. First, the franchisee must have the right to offer, sell or distribute goods or services. Second, the franchisor must substantially prescribe a marketing plan for the offering, selling or distributing of goods or services.'"  *Getty Petroleum Mktg., Inc. v. Ahmad*, 253 Conn. 806, 813, 757 A.2d 494 (2000) (quoting *Chem-Tek, Inc. v. General Motors Corp.*, 816 F. Supp. 123, 127 (D. Conn. 1993)).

"[W]hen determining whether there is a franchise relationship, . . . the relationship of the parties, . . . is not governed solely by the parties' main written agreement. Rather its legal significance is fixed by reality, not by what the defendants or the plaintiffs call it, though descriptive language may be relevant."  *Edmands v. CUNO, Inc.*, 277 Conn. 425, 439, 892 A.2d 938 (2006) (quotation marks, citations, and alterations omitted).  As this Court has previously observed, albeit in a different context, "[i]t is the independent function of the parties in a marketing arrangement that controls whether the parties have created a franchise."  *Trade Links, LLC v. BI-QEM SA de CV*, No. 3:19-CV-00308 (KAD), 2020 WL 1335688, at *10 (D. Conn. Mar. 23, 2020) (quoting *Getty*, 253 Conn. at 815).  Further, the absence of the plaintiff's assumption of a "substantial market risk" or "substantial indicia of entrepreneurial responsibility" undermines a finding that a franchise was created or that a plaintiff is a franchisee.  *Id*. (quoting *Getty*, 253 Conn.

at 815, 819). "Accordingly, 'one who acts as an agent for another in selling a product' does not ordinarily qualify as a franchisee.'" *Id*. (quoting *Getty*, 253 Conn. at 820).

The Court agrees with AFC that the complaint and the MDA do not enable a plausible inference that Purugganan acts as a franchisee for purposes of his CFA claim. The MDA confers upon Purugganan certain "master developer rights," including:

> the rights to (1) develop, open and operate Doctors Express Urgent Care Businesses in a mutually-agreed geographic area in Exhibit A (the "Territory"); (2) assist us with the sale of franchises (the "Franchises") to third parties (the "Franchisees") who will operate Doctors Express Urgent Care Businesses and/or manage Doctors Express Urgent Care Centers in the Territory; and (3) perform certain initial and ongoing support and assistance functions for (collectively, the "Servicing Responsibilities") and monitor the performance of (collectively, the "Monitoring Responsibilities") Franchisees in the Territory (collectively, the "Master Developer Rights").

(MDA Preamble § E.) Notably, the MDA "does not grant [Purugganan] the right to operate Doctors Express Urgent Care Businesses, the right to license others to operate Doctors Express Urgent Care Businesses or use the Marks or the System," as it "is *not* a license or a franchise agreement." (*Id*. § 1.3(b) (emphasis added).)[4] Instead, the MDA authorizes Purugganan to "solicit, evaluate, and screen individuals and entities to establish and operate Franchises within the Territory" subject to Doctors Express's—and thus AFC's—ultimate approval. (*Id*. § 1.1(b).)

Specifically, the MDA obligates AFC to provide Purugganan with "a franchise marketing strategy . . . for advertising to and soliciting" prospective franchisees, which he may not modify without AFC's written consent. (*Id*. § 8.1.) Purugganan is required to spend $3,000 per quarter on franchise sales efforts and must obtain AFC's approval for the use of any promotional material

---

[4] Purugganan alleges that at the time he executed the MDA he also "signed a Franchise Agreement with Doctors Express wherein he purchased the rights to a specified territory, site to be determined, to open and operate an urgent care center." (Compl. ¶ 12; *see also* Compl. Ex. B, ECF No. 1-3.) AFC acknowledges "that the MDA does require that a master developer also be a franchisee, but that franchisor-franchisee relationship is governed by a separate agreement." (AFC Reply at 6 n.3.) Because Purugganan's CFA claim is predicated on AFC's alleged unlawful termination of his master developer rights under the MDA and the denial of the commissions and fees he earns thereunder, and not on his rights under the separate franchise agreement, the Court confines its analysis to whether Purugganan has plausibly alleged that he is a franchisee under the MDA.

he uses in soliciting prospective franchisees.  (*Id.*)  The MDA in turn entitles Purugganan to a fee defined as 50% "of the Initial Franchise Fee" for each prospect that Purugganan refers and with whom AFC signs a franchise agreement within a prescribed time period.  (*Id.* § 4.1(a).)  The MDA also specifies the circumstances in which Purugganan is entitled to a commission in the event that a referral source or an existing franchisee refers a prospect to AFC with whom a franchise agreement is executed.  (*Id.* §§ 4.1(b)–(c).)  As noted, however, AFC ultimately retains the sole authority to approve prospective franchisees with whom it enters into franchise agreements.  (*Id.* §§ 1.1(b), 8.1.)  Purugganan also receives a fee comprised of 2.5% of the gross sales of each franchise for which he performs "Service Responsibilities and Monitoring Responsibilities."  (*Id.* § 4.2(a).)  He is required to "at all times, operate the Master Developer Business according to all of [AFC's] System Standards, as modified from time to time."  (*Id.* § 8.3.)  Purugganan's right to use AFC's Marks is "only for the limited purposes of soliciting Prospects and performing Servicing Responsibilities and Monitoring Responsibilities for Franchisees in the Territory."  (*Id.* § 9.1.)  AFC retains the right to inspect franchises in Purugganan's territory and audit his financial records pertaining to the master developer business.  (*Id.* §§ 14.1, 14.2.)

These provisions reveal perhaps that AFC may "substantially prescribe a marketing plan" that Purugganan must follow for purposes of step two of the franchisee inquiry.  It remains clear however that Purugganan does not "have the right to offer, sell or distribute goods or services" of the kind offered under AFC's mark, *i.e.*, urgent medical care, for purposes of the first step of the inquiry, so as to create a plausible inference that he is a franchisee.  *Getty*, 253 Conn. at 813.  Indeed, rather than sell, offer, or distribute goods or services, he recruits prospective franchisees who will in turn offer their own services—*i.e.*, the provision of patient care services through franchised urgent care centers.  In other words, Purugganan "acts as an agent for another in selling

13

a [service]" as opposed to offering and selling a service himself.  *Trade Links*, 2020 WL 1335688, at \*10 (quoting *Getty*, 253 Conn. at 820); *see also Rudel Mach. Co. v. Giddings & Lewis, Inc.*, No. 3:97-CV-1115 (RNC), 2001 WL 36210782, at \*2 (D. Conn. July 25, 2001) ("Being involved in the process of promoting another's [services] simply is not the same as having been granted the right to engage in the business of selling them").   While Purugganan argues that the $189,000 he expended in acquiring his master developer rights evidences the market risk he assumed and his "substantial entrepreneurial responsibility" (Pl.'s Mem. at 9) the Court disagrees that the Plaintiff's investment alone establishes the type of market risk and entrepreneurial character sufficient to create a franchise.  The MDA does not provide, and Purugganan does not argue, that Purugganan assumes the financial risk of opening and operating a Doctors Express franchise or of selling urgent care medical services.  These risks are clearly borne by the franchisee that contracts with Doctors Express/AFC directly.

Having concluded that Purugganan is not a franchisee within the meaning of the Connecticut Franchise Act, the Court will enter judgment on the pleadings in favor of AFC on Count Ten of the complaint.

### Sherman Act Claims

Purugganan alleges that AFC's purchase of the franchises in his territory with the intent to transform them into AFC corporate stores constitutes "an illegal contract in restraint of trade or commerce" (Compl. ¶ 79), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  He further alleges that AFC "is attempting to monopolize the territory purchased by Plaintiff, and . . . is attempting to establish a monopoly in the New England states" (Compl. ¶ 80), in violation of

Section 2 of the Sherman Act, 15 U.S.C. § 2.  AFC argues that Purugganan has failed to state a claim under either of these provisions and that, as a threshold matter, he lacks antitrust standing.[5]

Purugganan makes little effort to either effectively allege a Sherman Act violation or explain how this straightforward contract dispute implicates the antitrust concerns sought to be addressed by the Act as embodied in the standing requirements noted below.

Standing aside, "[t]he Sherman Act aims to protect competition as a whole in the relevant market, not the *individual competitors within that market.  Disputes between business competitors thus are not* the proper subjects of antitrust actions."  *United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) (internal quotation marks and citation omitted) (emphasis added).  Purugganan's claims that AFC's acquisition of franchises in his territory constitutes "an illegal contract in restraint of trade or commerce" and an attempted monopolization of the Plaintiff's territory (Compl. ¶¶ 79–80) are conclusory and inadequate. They do not plausibly allege that AFC has illegally restrained competition in the urgent care franchise market writ large—a market that is wholly undefined by the Plaintiff; these claims merely allege that AFC is unlawfully competing with Purugganan

---

[5] "To satisfy antitrust standing at the pleading stage a plaintiff must plausibly allege two things: (1) that it suffered a 'special kind of antitrust injury,' and (2) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws."  *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019) (*quoting Gatt Commc'ns Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (internal quotation marks omitted).  The Second Circuit has "established a three-part test for determining whether the plaintiff has alleged an antitrust injury: (1) the court must identify the practice complained of and the reasons such a practice is or might be anticompetitive[;] (2) the court must identify the actual injury the plaintiff alleges . . . which requires [it] to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct[;] and (3) the court compares the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges."  *Id.* at 62–63 (internal quotation marks, citations, and alterations omitted).  As to the second requirement, "[a] four-factor test is employed to determine whether an antitrust plaintiff is an efficient enforcer," in which the Court "must evaluate: (1) 'the directness or indirectness of the asserted injury,' (2) 'the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement,' (3) 'the speculativeness of the alleged injury,' and (4) 'the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.'"  *Id.* at 65 (quoting *Daniel v. Am. Bd. of Emergency Medicine*, 428 F.3d 408, 443 (2d Cir. 2006)).  Purugganan does not attempt to defend his ability to establish antitrust standing in his opposition brief.

individually.  *See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) ("Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.  Were the law construed otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act because of its too ready availability") (internal citation omitted).

Nor does the complaint so much as identify a relevant product or geographic "market" outside of the Plaintiff's own contracted-for territory.  "[I]n order to survive a motion to dismiss, it is appropriate for a district court to assess whether the plaintiff['s] complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market." *Concord Assocs., L.P. v. Entm't Properties Tr.*, 817 F.3d 46, 53 (2d Cir. 2016).  Purugganan has done neither. *See also Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*, 516 F. Supp. 2d 270, 293 (S.D.N.Y. 2007) ("Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted.") (quoting *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997)).   In his opposition Purugganan relies upon his conclusory allegation that AFC's "purchases and transformations to corporate stores would prevent potential franchisees from opening, thereby decreasing competition among franchisees." (Compl. ¶ 27.)[6]  This broad assertion that other prospective franchisees will suffer harm as a result of AFC's actions is insufficient to transform his contract dispute with AFC into a claim of antitrust dimensions.

---

[6] This Court has previously observed that these opinion-based conclusory allegations are also illogical.  Whether these franchises are owned by AFC or a franchisee, the centers will still be operating within the territory in competition with others, present and prospective, in the urgent case business.

For these reasons, whether due to a failure to establish antitrust standing (which Purugganan did not address, *see* n.5, *supra*) or a failure to state a plausible claim under the Sherman Act, Purugganan's claims against AFC are plainly inapposite to any antitrust theory of liability and the Court accordingly grants judgment on the pleadings in favor of AFC as to Count Seven.[7]

**Bad Faith, Promissory Estoppel, and UCC**

AFC next argues that Purugganan cannot maintain independent causes of action for breach of the covenant of good faith and fair dealing, promissory estoppel, and a violation of the Uniform Commercial Code, as these claims are subsumed by his breach of contract claim under Maryland law. Purugganan does not meaningfully respond to these contentions beyond reiterating his belief that Maryland law does not apply. He advances his arguments under Connecticut law, which, the Court has already determined, is not applicable.

First, AFC is correct that "no independent cause of action at law exists in Maryland for breach of the implied duty of good faith and fair dealing." *Mount Vernon Properties, LLC v. Branch Banking and Tr. Co.*, 170 Md. App. 457, 472, 907 A.2d 373 (Md. Ct. Spec. App. 2006); *see also, e.g.*, *Thompson v. Naval Acad. Athletic Ass'n*, No. CIV.A. RDB-12-2676, 2013 WL 3965100, at *7 (D. Md. Aug. 1, 2013) (explaining that "Maryland does not recognize an independent cause of action for breach of the implied contractual duty of good faith and fair dealing. . . . Instead, the duty of good faith and fair dealing is merely part of an action for breach of contract.") (quotation marks and citations omitted). Because Purugganan has pled a

---

[7] In addition to the above cited deficiencies, AFC also correctly argues that Purugganan fails to allege a plausible conspiracy to restrain trade under Section 1 of the Sherman Act, which requires "a combination or some form of concerted action between at least two legally distinct economic entities"—not "[u]nilateral conduct on the part of a single person or enterprise." *Capital Imaging Assocs.*, 996 F.2d at 542. Nor does he allege "1) the possession of monopoly power in the relevant market and 2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident," *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 140 (S.D.N.Y. 2016), on behalf of AFC so as to state a monopolization claim under Section 2. (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*per curiam*)).

simultaneous claim for breach of the MDA, the motion for judgment on the pleadings as to Count Three of the Plaintiff's complaint is granted without prejudice to the filing of an amended complaint in light of the Plaintiff's request that he be permitted to amend his contract cause of action consistent with Maryland law.

Second, courts applying Maryland law have likewise recognized "that, under the U.C.C. as well as the general law of Maryland, there is no independent duty of good faith in commercial dealing enforceable by an action *ex delicto*." *Howard Oaks, Inc. v. Maryland Nat. Bank*, 810 F. Supp. 674, 677 (D. Md. 1993); *see also Marland v. Safeway, Inc.*, 65 F. App'x 442, 449 (4th Cir. 2003) (agreeing with weight of authority that Maryland does not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing as codified in the UCC). As discussed above, Purugganan cites no authority to the contrary. The motion for judgment on the pleadings as to Count Four of the complaint is therefore granted.

As to the promissory estoppel claim, "[a] claim for promissory estoppel is 'a device for contractual recovery, when an element of a traditional bilateral contract is lacking,' such as acceptance or consideration." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 609 (D. Md. 2015) (quoting *Md. Transp. Auth. Police Lodge No. 34 of Fraternal Order of Police v. Md. Transp. Auth.,* 195 Md. App. 124, 218, 5 A.3d 1174 (Md. Ct. Spec. App. 2010), *rev'd in part on other grounds*, 420 Md. 141, 21 A.3d 1098 (Md. 2011). "Once it is established, either by an admission of a party or by a judicial finding, that there is in fact an enforceable contract between the parties . . . then a party may no longer recover under the theory of promissory estoppel." *Id.* (quotation marks and citation omitted). Here, both Purugganan and AFC have acknowledged and agree that the MDA, in fact, governs their rights and obligations with respect to the claims in this litigation, thus precluding either party from relying upon, in the alternative,

the lack of an enforceable contract as a basis for recovery.  *See Ver Brycke v. Ver Brycke*, 379 Md. 669, 693 n.9, 843 A.2d 758 (Md. 2004) ("We observe that the Ver Bryckes' unjust enrichment and promissory estoppel claims, which are quasi-contract claims, would have been untenable had they argued that a contract had existed between them and John and Lisa. As we explained in *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 747 A.2d 600 (2000), '[t]he general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests.'").  The motion for judgment on the pleadings is therefore granted as to Count Five.

**Tortious Interference**

Count Eight of the complaint pleads a claim for tortious interference with contractual relations and prospective economic advantage.   "Tortious interference with contract is a recognized cause of action in Maryland, and it has five elements: '(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff.'"  *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724, 729 (D. Md. 2017) (quoting *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466, 598 A.2d 794 (Md. Ct. Spec. App. 1991)).  "Tortious interference with contract is often viewed in comparison to a related tort, tortious interference with prospective economic relations."  *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 693 (D. Md. 2012).  "[T]his tort applies to 'maliciously or wrongfully interfering with economic relationships in the absence of [a] breach of contract.'"  *Id*. at 695 (*quoting Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69, 485 A.2d 663 (Md. 1984)).  "Although variously named, the tort requires a showing of (1) an intentional and willful act; (2) calculated to cause damage to the plaintiff in his lawful business; (3) done with the

unlawful purpose to cause such damage and loss; without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) that caused actual damage or loss." *Id.*

Neither Purugganan in his complaint, nor AFC in its memorandum, acknowledges the distinction between these two causes of action. Nonetheless, AFC argues that Purugganan cannot state a claim for tortious interference because any relationship between Purugganan and third-party franchisees is governed by the MDA, and AFC cannot be held liable for interfering with its own contract. Purugganan responds that whether his rights with respect to third-party franchisees arose from the MDA is immaterial, as he maintains business relationships with the franchisees distinct from his relationship with AFC, and he alleges that AFC has tortiously interfered with those relationships. He does not, however, identify any specific relationship or its nature or source. Neither does he identify any "actual damage or loss," separate from those flowing from the provisions of the MDA, that he has or might sustain as a result of the alleged interference.

First, the Court agrees that the complaint fails to plead a cognizable claim for tortious interference with contract. To the extent the contract at issue is the MDA, the Court of Appeals of Maryland "has never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract." *K & K Mgmt., Inc. v. Lee*, 316 Md. 137, 156, 557 A.2d 965 (Md. 1989) (quotation marks and citation omitted). Further, Purugganan does not allege that he had any contractual relationship with the franchisees in his territory with which AFC interfered and he does not otherwise identify any contract between himself and any other third party with which AFC interfered.

For similar reasons, the Court also agrees that to the extent the complaint could be construed as alleging a claim for tortious interference with prospective economic relations, the complaint does not plausibly allege such a claim. It is "well-established" under Maryland law

"that, for the tort of wrongful interference with economic relations to lie, the defendant tortfeasor cannot be a party to the economic relationship with which the defendant has allegedly interfered." *Kaser v. Fin. Prot. Mktg., Inc.*, 376 Md. 621, 639, 831 A.2d 49 (Md. 2003). Purugganan does not allege any independent relationship between an existing or prospective third-party franchisee that does not derive from the MDA and his role as a master developer, and consequently, from the relationship with AFC. The tortious interference with prospective economic relations claim therefore fails.

For these reasons the motion for judgment on the pleadings with respect to Count Eight is granted.

**Abuse of Process**

Purugganan's abuse of process claim is based on AFC having "improperly and prematurely commenced a separate action in Alabama State Court" after Purugganan demanded mediation under the MDA. (Compl. ¶ 118.) He alleges that the Alabama action "was a perverse use of legal process, done with malicious intent to vex and trouble, punish, harass and intimidate Plaintiff with reckless indifference to the rights of the Plaintiff," and that he has suffered damages that include his attorney's fees in defending the Alabama action. (*Id.* ¶¶ 120–21.)

"[T]he elements of the tort of abuse of civil process in Maryland are: (1) a willful use of civil process on the part of the defendant after the process has issued in a manner not contemplated by law; (2) an ulterior motive; and (3) damages resulting from the defendant's abuse of process in the form of arrest of the person or seizure of property of the plaintiff." *In re Joseph Smith & Sons, Inc.*, 121 F.3d 698 (Table), 1997 WL 436746, at *2 (4th Cir. 1997) (*per curiam*). As to the last element, the Court of Appeals of Maryland has explained:

All the cases upon this subject depend either upon the arrest of the person or seizure of his property; and we have been referred to none where this action was sustained for an injury to

the plaintiff's business or good name. Any unfounded suit may result in such injury; but it will hardly be seriously contended that where there has been no wrongful deprivation of liberty or no illegal seizure of property, that each unfounded suit is to be treated as such an abuse of [the] process of the law as will sustain action against the one who instituted it.

*Id*. (quoting *One Thousand Fleet Ltd. P'ship v. Guerriero*, 346 Md. 29, 45–46, 694 A.2d 952 (Md. 1997)).

Here, Purugganan does not allege a deprivation of liberty or illegal seizure of property arising from AFC's alleged wrongful commencement of suit, and thus the mere monetary injuries he may have suffered in defending suit in Alabama are insufficient to state a claim for abuse of process under Maryland law.[8]  Judgment on the pleadings will accordingly enter in favor of AFC on Count Twelve.

**Conclusion**

For the foregoing reasons, the Defendant's motion to dismiss is denied to the extent it is predicated on lack of Article III standing.  The Defendant's motion for partial judgment on the pleadings is otherwise granted in full.

**SO ORDERED** at Bridgeport, Connecticut, this 24th day of February 2021.

> */s/ Kari A. Dooley*
> KARI A. DOOLEY
> UNITED STATES DISTRICT JUDGE

---

[8] As AFC notes, Maryland law also recognizes a separate cause of action for malicious use of process, which requires a plaintiff to establish, *inter alia*, "that wrongful proceedings caused an arrest, a seizure of property, or other 'special injury.'"  *One Thousand Fleet*, 346 Md. at 44.  "The mere expense and annoyance of defending a civil action is not a sufficient special damage or injury to sustain an action for malicious prosecution."  *Id*. (quotation marks and citation omitted).  For similar reasons, then, Purugganan fails to plead a cognizable claim for malicious use of process.